**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| RONALD FEINSTEIN,            ) | |
|                          ) | |
|          **Plaintiff,**      ) | |
|                          ) | |
|         **v.**             ) | **No. 06 C 932** |
|                          ) | |
| **MICHAEL J. ASTRUE, Commissioner of**   ) | |
| **Social Security Administration,**      ) | **Judge Rebecca R. Pallmeyer** |
|                          ) | |
|         **Defendant.**[1]     ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Ronald Feinstein seeks disability insurance benefits and Supplemental Security Income from the Social Security Administration ("SSA"). He applied for these benefits in September 2002, claiming that he was unable to work due to back pain and clinical depression. The SSA denied his application in December 2005. In this action to review the denial of benefits, each party has moved for summary judgment. In addition, Plaintiff has moved to supplement the record with certain medical reports not considered during the hearing before the Administrative Law Judge ("ALJ"). For the reasons set forth below, the motion to supplement is denied, Defendant's motion for summary judgment is granted, and Plaintiff's motion for summary judgment is denied.

## BACKGROUND

The following facts are drawn from the Administrative Record, including the transcript of the May 17, 2005 hearing before ALJ John L. Mondi.

### I.     Plaintiff's Work History

Plaintiff was born on June 4, 1957 (R. at 234), and is a college graduate with experience working in the financial services industry. (R. at 99.) The first employment Plaintiff noted in his application for disability benefits was from 1984 to 1989, when he worked as a technical market

---

[1]     Michael J. Astrue is substituted for Jo Anne B. Barnhart as the Commissioner of Social Security. FED. R. CIV. P. 25(d).

analyst for a futures brokerage. (*Id.*) From 1989 until either 1995 or 2000[2], Plaintiff owned his own consulting business, and acted as a trading advisor for his clients while also running a brokerage firm. (R. at 99, 104, 250-251.) Beginning in 2000, Plaintiff was employed as a retail future broker for a futures brokerage. (R. at 99-100.) In that position, Plaintiff conducted "real-time market analysis," which consisted of following the market minute-by-minute, and predicting changes that would occur five to fifteen minutes in the future. (R. at 100, 264.) He contends that the job required intense concentration and instantaneous processing of information. (*Id.*) The job's physical demands were less intense: Plaintiff was required to stand approximately one hour a day and to sit more than six hours a day. (R. at 100.) He left this job in April 2001, allegedly because lumbar spine pain prohibited him from sitting in his office. (R. at 99, 249.) Plaintiff identifies no other work history, aside from a week-long return to work at a brokerage firm in 2002 and a two-day stint as a courier in 2003. (R. at 99, 250.)

## II.    Plaintiff's Medical History

The spine has three segments: the cervical spine (upper spine, or neck), thoracic spine (upper back), and lumbar spine (lower back). Each spinal segment contains several vertebral bodies, which are referred to as, for example, lumbar four, or L4. Plaintiff's claimed disability primarily concerns the lumbar spine. Plaintiff traces his lumbar spine at least in part, to an all-terrain-vehicle accident that occurred in the mid-1990s (the record is inconsistent as to whether the date was 1994 or 1995). (R. at 125, 251.)

To treat his pain, Plaintiff has consulted with a number of physicians; many of their notes are part of the administrative record. Dr. Alfred Torrence's notes reflect that Plaintiff experienced chronic pain in his lower back since at least January 1998. (R. at 227.) Dr. Torrence referred

---

[2]    According to Plaintiff's work history report, he was self-employed from 1989 to 2000 (R. at 99); however, at the hearing, Plaintiff testified that he owned his own business until 1995 and did no work at all from 1995 to 2000. (R. at 250-251.)

Plaintiff to Dr. George R. Cybulski (*id.*), whose treatment notes reflect that Plaintiff presented with lower back pain in January 1998. (R. at 226.) When he first began treating Plaintiff, Dr. Cybulski ordered an MRI, which revealed lumbar radiculopathy localized on the left. (R. at 231.)[3] Plaintiff's January 1998 MRI also indicated a compression fracture at L1 and left foraminal disc herniation at L4-5. (*Id.*)

In March 2001, Dr. Christina Richardson, a resident at the Rehabilitation Institute of Chicago, Center for Pain Studies, examined Plaintiff. (R. at 125-130.) Her notes show that Plaintiff reported constant pain, which ranged from stabbing to aching, in his right lower back. (R. at 125.) This pain made it impossible for Plaintiff to engage in certain recreational activities–including snowboarding and motorcycle riding. (*Id.*) As of March 2001, Feinstein remained able, however, to work full time as a futures broker and to perform unspecified activities of daily life. (R. at 127.) He spent "approximately 2/3 of his day up and around" (it is unclear whether this means 2/3 of Plaintiff's waking day or 2/3 of a 24-hours span). (*Id.*) Although Dr. Richardson concluded that Plaintiff mildly dramatized his situation, she did not believe that he was exaggerating his symptoms. (R. at 126.)

Plaintiff experienced some relief from medication and limited relief from facet injections (Plaintiff's first, which he received six months before his appointment with Dr. Richardson, provided four months of relief, while the second, which he received two weeks before his appointment with Dr. Richardson, provided no significant relief). (R. at 126.)[4] Dr. Rittenberg of the Center for Spine, Sports, & Occupational Rehabilitation ordered "Zygapophysial Joint Injections" (facet injections) in

---

[3]        Radiculopathy is a nerve root disorder caused by chronic pressure on a root in or along the spine. Mark H. Beers, ed. in chief, *The Merck Manual of Diagnosis and Therapy* ("*The Merck Manual*") 1901 (18th ed. 2006).

[4]        A facet injection is an injection of a steroid and anesthetic numbing agent into a facet joint of the spine. *See* http://www.mayfieldclinic.com/PE-FACET.htm. It can be used to diagnose the source of back pain and to block pain originating in the facet joints. *Id.*

August 2000 and March 2001 for Plaintiff.  (R. at 223, 224.)  The first provoked Feinstein's usual symptoms (indicating that Dr. Rittenberg had identified and targeted the source of Feinstein's pain); the second did not.  (*Id.*)  Plaintiff experienced no "significant relief" from physical therapy, although Dr. Richardson's notes do not make clear when he attempted physical therapy or what that therapy included.  (R. at 126.)  During the physical examination, Dr. Richardson recorded that Plaintiff's cervical spine range of motion was "within functional limits of normal" but that he had increased pain when she performed the thoracic and lumbar spine examinations, as well as mild decreased range of motion through the lumbar spine.  (R. at 129.)

Cataloging Plaintiff's medical history, Dr. Richardson noted that Plaintiff underwent surgical fusion and repair of disk herniation in his cervical spine in 1996, which almost entirely resolved his cervical spine pain.  (R. at 125.)  Dr. Richardson's notes record that Plaintiff's lower, or lumbar, back pain, on the other hand, had been continual since 1994, and had interfered with Plaintiff's daily life.  (*Id.*)  At the time of Dr. Richardson's examination, Plaintiff's most recent x-rays were from August 2000; they demonstrated that Plaintiff suffered from "degenerative disk disease at the L2-3 and L4-5 levels with an old wedge compression deformity in L1."  (R. at 126; *see also* R. at 225.)  No further information about these x-rays is available in Dr. Richardson's notes.  Based on Plaintiff's symptoms and test results, attending physician Dr. R. Norman Harden diagnosed Plaintiff with "low back pain most consistent with arthritis of the facet joints" in March 2001.  (R. at 184.)  Dr. Harden recommended that Plaintiff enroll in an interdisciplinary chronic pain management program, scheduled to last between one and four weeks.  (*Id.*)

Beginning in May 2002, Plaintiff visited Dr. Charles Carroll IV, an orthopaedic surgeon, several times.  Dr. Carroll treated Plaintiff for injuries to his left shoulder, right elbow, and left hand. The majority of information about these visits is contained in reports Dr. Carroll wrote to Dr. Torrence.  At the time of his first visit to Dr. Carroll, Plaintiff was "an avid motorcycle rider."  (R. at 152.)  During a May 20, 2002 visit, Plaintiff reported a ganglion cyst on his "left long finger" and pain

and swelling in his right elbow. (R. at 152-3.) Dr. Carroll excised Plaintiff's cyst later that month. (R. at 134.) The next month, on June 10, Dr. Carroll reported that Plaintiff had "symptoms of right lateral epicondylitis" (tennis elbow) and has had pain on resisted extension and palpation "for a number of years"; Plaintiff nevertheless retained full range of motion. (R. at 151.) Plaintiff also reported pain in his left shoulder on June 10, and Dr. Carroll identified evidence of impingement requiring therapy. (*Id.*)[5] In a letter to Dr. Torrence dated August 2, Dr. Carroll reported that Plaintiff still had pain in his left shoulder but that the pain in his right elbow had improved (the letter does not explain why). (R. at 150.) Plaintiff's left hand–which had completely healed by June–was still "doing well." (*Id.*) Dr. Carroll recommended unspecified "home therapy" for the shoulder injury. (*Id.*) Dr. Carroll also referred Plaintiff to Dr. Brian J. Murphy for an MRI. According to Dr. Murphy's August 2, 2002 MRI analysis, Plaintiff suffered from mild inflammation, degeneration, or contusion of the left shoulder. (R. at 154.) Based on these findings, Dr. Carroll informed Dr. Torrence that the MRI suggested a "supraglenoid cyst, labral tear, and impingement" of that shoulder. (R. at 149.) Plaintiff was experiencing pain on motion and "a hint of instability," which was consistent with the suggestion of impingement. (*Id.*)

On September 25, Dr. Carroll injected Marcaine and Celestone into Plaintiff's left shoulder (which provided three days of relief), and found no "obvious instability" of Plaintiff's left shoulder. (R. at 146-48.) On that date, Dr. Carroll reported to Dr. Torrence that Feinstein was considering applying for Social Security benefits. (R. at 147.) On October 7, Dr. Carroll found a hint of instability in Plaintiff's left shoulder, and positive signs of impingement. (R. at 146.) He also reported that Plaintiff had a full range of motion and an intact neurologic and vascular examination. (*Id.*) To treat Plaintiff's impingement, Dr. Carroll performed arthroscopy of Plaintiff's left shoulder

---

[5]      According to the American Academy of Orthopaedic Surgeons, impingement "results from pressure on the rotator cuff from part of the shoulder blade (scapula) as the arm is lifted" and causes shoulder pain. *See* http://orthoinfo.aaos.org/topic.cfm?topic=a00032.

on November 7. (R. at 161-63.) The pre-operative examination revealed mild anterior instability and full motion of the shoulder. (R. at 162.) By January 2003, Dr. Carroll noted that Plaintiff's shoulder and elbow pain were "resolved," and that Plaintiff experienced no numbness or tingling. (R. at 172.) He had a full range of motion. (*Id.*) Thus, Dr. Carroll advised Dr. Torrence in January 2003 that Feinstein could return to "full and unrestricted activity." (*Id.*)

As noted, Plaintiff had applied for Social Security disability benefits in September 2002. One month later, he visited Dr. Fauzia A. Rana at the Lake Shore Medical Clinic, Ltd. in connection with his claim for benefits. (R. at 166-168.) Although Dr. Rana did not have access to Plaintiff's medical records, he was able to physically examine Plaintiff. (R. at 166.) Dr. Rana observed that Plaintiff had no difficulty moving throughout the examination, that Plaintiff exhibited no swelling or tenderness in any joint or limitation of movement in any portion of his spine, but that there was some limitation of movement in Plaintiff's left shoulder. (R. at 167-168.) Dr. Rana also noted that Feinstein had no history of radiation of pain from the arms to the neck, but that he did complain of pain in his back and neck, as well as "off and on" pain in his left shoulder. (R. at 166.) Feinstein had no limitation of movement in his spine. (R. at 168.) Dr. Rana recorded that Plaintiff was scheduled for rotator cuff surgery with Dr. Carroll in November. (R. at 166.) Dr. Rana concluded that the Plaintiff had "possible degenerative arthritis." (R. at 168.) In terms of Plaintiff's mental state, Dr. Rana described his ability to concentrate as "fair." (*Id.*)

In December 2002, a state-appointed physician, Dr. Reynaldo Gotanco, performed an assessed of Plaintiff's residual functional capacity, in light of his left shoulder pain and low back pain. (R. at 174-181.) Dr. Gotanco noted that no treating source statement regarding Plaintiff's physical capacity was available to him in making his assessment. (R. at 180.) Based on the information he did have, Dr. Gotanco concluded that Plaintiff could stand and/or walk six hours in a workday, and could sit for about six hours in a workday. (R. at 175.) He found that Plaintiff's pain might limit his ability to balance, reach, lift and/or carry. (R. at 175-77.) In support of this finding

6

concerning Plaintiff's reaching ability, Dr. Gotanco noted that Plaintiff's left shoulder can abduct only to 100 degrees due to pain. (R. at 177.) The normal range of abduction–or raising the arms away from the body and above the head with elbows held straight–is 180 degrees. He also noted that Plaintiff was scheduled for left shoulder surgery (the court is uncertain which surgery Dr. Gotanco referred to). (R. at 181.) These findings were reviewed and affirmed by a T. Arjmand, M.D. on March 26, 2003. (R. at 174.)

Meanwhile, Plaintiff continued to seek medical care for his low back pain. A June 2003 MRI of Plaintiff's lower back, ordered by an orthopaedic surgeon, Dr. Michael F. Schafer, revealed desiccation, or drying out, of several lumbar discs, including L1-2, L2-3, and L4-5. (R. at 182.)[6] The MRI also revealed minor kyphotic deformity centered at L1, though there was no finding of subluxation or fracture. (*Id.*)[7] In addition, Plaintiff suffered from mild generalized disc bulge at L1-2 and L2-3 as well as a more broad-based disc bulge and mild stenosis at L4-5. (*Id.*)[8] In July 2003, Dr. Cybulski, a neurosurgeon, evaluated Plaintiff and advised Dr. Torrence that he believed Plaintiff suffered from L4-5 spinal stenosis with no radiculopathy. (R. at 220.) He concluded that surgery was not indicated and instead prescribed a course of lumbar epidural steroid injections. (*Id.*)

Dr. Cybulski referred Plaintiff to Dr. Jeffrey A. Katz, an anesthesiologist, for the steroid injections. In early August, Dr. Katz noted that Plaintiff had full range of motion in his lumbar spine, that his gait and heel-and-toe walking were unremarkable, and that motor and sensory testing as

---

[6]     Dr. Schafer also treated Plaintiff for his cervical spine issues in May 1996. (R. at 228-230.)

[7]     "Kyphosis is a curving of the spine that causes a bowing of the back." See http://www.nlm.nih.gov/medlineplus/ency/article/001240.htm. Subluxation is partial dislocation or misalignment between the vertebrate. *The Merck Manual* at 328*.*

[8]     Lumbar spinal stenosis is defined as a narrowing of the lumbar spinal canal, which can cause positional back pain and symptoms of nerve root compression. *The Merck Manual* at 328.

unremarkable in both legs as well.  (R. at 187-8.)  On September 11, 2003, Dr. Katz informed Dr. Cybulski that he had performed two lumbar epidural steroid injections to treat Plaintiff's lumbar stenosis and low back pain.  (R. at 186.)  According to Dr. Katz, the first injection provided little relief, but the second provided 80% relief.  (*Id.*)  In fact, approximately three weeks after the second injection, Dr. Katz reported to Dr. Cybulski that Plaintiff was doing so well that he had decided not to get a third injection.  (*Id.*)  At that time, the Plaintiff assessed his pain at only a two out of ten, although it increased when he twisted his back.  (R. at 192.)  According to Dr. Cybulski's March 2004 notes, a third injection was performed in October 2003, and it provided 80% relief of Plaintiff's pain for approximately three months.  (R. at 193.)

A February 2004 CT scan of Plaintiff's lumbar spine, ordered by a radiologist, Dr. Matthew T. Walker, revealed a small disc bulge at L1-2, disc degeneration and a small disc bulge at L2-3, and diffuse disc disease as well as "parasagittal/foraminal radial tears" and slight disc prominence at L4-5.  (R. at 203.)  Dr. Walker also conducted a discography the same month, which revealed diffuse degeneration of L2-3, with annual tears, and diffuse degeneration of L4-5, also with an annual tear.  (R. at 201.)[9]  The physicians conducting the discography–Dr. Walker along with a resident–concluded that there was a clinically positive discogram at L2-3 and clinically negative discogram at L3-4 and L4-5.  (R. at 202.)  A copy of these results was sent to Dr. Cybulski and to Dr. Katz.  (*Id.*)

Plaintiff then visited Dr. Michael Haak, an orthopaedic surgeon, who concluded from Plaintiff's diagnostic imaging and discography reports that Plaintiff had low back pain and lumbar degenerative disc disease.  (R. at 214-215.)  Dr. Haak's physical examination revealed tenderness

---

[9]    According to the North American Spine Society, discography (also known as diskography) is a procedure by which an individual's lumbar disks are injected with "contrast," which is a liquid that appears on an x-ray.  *See* http://www.spine.org/Documents/discography_2006.pdf. If the disk is normal, the contrast will remain in the center of the disk.  *Id.*  If not, it will spread through the tears in the disk.  *Id.*  The procedure is used to isolate the source of an individual's pain. *Id.*

in the lower portion of Plaintiff's lumbar spine, as well as limitations in Plaintiff's range of motion. (R. at 214.) Dr. Haak believed that Plaintiff could benefit from disc replacement, disc fusion, or Intradisc Electrothermal Therapy (IDET). (R. at 215.)[10] Ultimately, however, Plaintiff's insurance refused coverage for IDET. (R. at 185.)

Finally, in an April 2005 letter to ALJ Mondi, Dr. Torrence stated that Plaintiff had chronic lower back pain, was unresponsive to treatment, and was in constant pain and unable to sit or stand for any substantive period of time. (R. at 213.) He noted that Plaintiff must often lie down for relief. (*Id.*) Thus, Dr. Torrence wrote that he is "overwhelmingly convinced that [Plaintiff] is disabled from his back condition." (*Id.*)

## III. Procedural History

### A. Application

On September 6, 2002, Feinstein applied for disability insurance benefits and Supplemental Security Income under the Social Security Act, alleging disability as a result of depression and a back injury. (R. at 45-47, 234.) Plaintiff alleges that he was disabled as of 2001. (R. at 245.)[11] In connection with this application, he completed a Disability Report, in which he claimed to have difficulty concentrating, difficulty sitting, limited mobility, and a limited ability to reach. (R. at 86.) He noted that he was taking medication for depression, back pain, and swelling. (R. at 91.) Plaintiff also submitted an Activities of Daily Living Questionnaire, in which he claimed to be able to complete most activities of daily life, though he had trouble putting on shirts and jackets, twisting lids on jars, and carrying things. (R. at 114.) He also claimed to be able to sit for just twenty

---

[10] IDET "is a new minimally invasive treatment option for patients with low back pain caused by tears in the outer wall of the intervertebral disc. It involves the use of heat to theoretically modify the collagen fibers of the disc and destroy the pain receptors in the area." *See* http://www.spine.org/Pages/ConsumerHealth/SpineConditionsAndTreatments/CommonProblems CorrectiveActions/NewSpineCareTreatmentOptions/IntradiscalElectrothermalTherapy(IDET).aspx.

[11] Plaintiff has also claimed that his illness and/or injuries first bothered him in March 1994, and rendered him unable to work in August 2002. (R. at 86.)

minutes before experiencing lower back pain, and to be unable to play sports, exercise, do yard work, or perform household chores and repairs. (R. at 115-16.) Plaintiff's sister, Dr. Kate Feinstein, also completed an Activities of Daily Living Questionnaire. In it, she noted that Plaintiff can no longer perform yard work, heavy cleaning, or household repairs. (R. at 118.) She also stated that Plaintiff had difficulty with problem solving, attention span, and concentration. (R. at 119-21.) Plaintiff was able, however, to drive two to three times per week, go out to eat once a week, care for himself, do light cleaning, cook his meals, and visit friends and family. (R. at 118-20.) Having considered this information, the SSA denied Plaintiff's claim in January 2003, finding that Plaintiff was not disabled (R. at 30-34); this denial was affirmed on reconsideration in April 2003 (R. at 36-39).

### B.    Administrative Hearing

Following these denials, Plaintiff appeared at an administrative hearing on May 17, 2005, accompanied by counsel. (R. at 241-267.) Plaintiff testified that the health problem he wanted the ALJ to consider was his lumbar spine injury, but noted that he has also had to deal with a variety of other injuries. (R. at 252-53.) Plaintiff described his medical ailments, and the treatment he has received for them, at the hearing. He referred to his two successful neck (or cervical spine) surgeries in 1996 and his efforts, after recovering from cervical spine injuries, to address his lumbar spine pain. (R. at 251-52.) For this, in 1998, Plaintiff visited his personal physician, Dr. Torrence, who referred him to a neurosurgeon, Dr. Sabulsky. (*Id.*) In 2000, Plaintiff consulted with Drs. Rittenberg and Harden. (*Id.*) Plaintiff also described injuries to his left hand, left shoulder, and right elbow, each of which he recovered from after surgery and physical therapy in 2002. (R. at 253.) Finally, Plaintiff suffers from double vision as a result of a surgery he had as a child. (R. at 255.)

Plaintiff testified that he is constant pain. (R. at 265.) He does, however, retain some mobility: he can sit for about fifteen minutes, can stand for twenty to thirty minutes, and can walk two to three blocks. (R. at 254.) He can climb up a flight of stairs. (*Id.*) Though he tries not to lift

anything if possible, he is able to lift the weight of a gallon of milk.  (*Id.*)  He can bend and twist, albeit with extreme pain.  (*Id.*)  Plaintiff is able to care for himself and, though he finds it a challenge, he is able to care for his home, as well.  (R. at 255.)  He walks to the drug store located "a couple" blocks from his home and drives to the local grocery store once every week to two weeks.  (R. at 256.)  Though he finds it difficult, he is able to drive a manual transmission truck without power steering.  (R. at 255.)

Turning to his mental state, Plaintiff testified that he suffers from clinical depression, but clarified that the depression is not a "major problem" for him, as he is able to control it with medication.  (R. at 253.)  Some of the medication Plaintiff takes (though his testimony does not make clear for what condition the medicine was prescribed) makes him "very sleepy."  (R. at 253-54.)  In addition, Plaintiff claims his physical pain affects everything he does, including his ability to concentrate.  (R. at 265-66.)  According to his attorney, Plaintiff is unable to concentrate for more than two hours a day.  (R. at 263.)

Describing the impact these injuries had on his professional life, Plaintiff explained that from 1989 to 1995, he had his own investment business, in the futures industry.  (R. at 250-51.)  In 1995, after his ATV accident, Plaintiff could no longer serve his clients, and was forced to give up his business.  (R. at 251.)  Between 1995 and 2000, Plaintiff did "[a]bsolutely nothing": he had no job and was not looking for a job.  (*Id.*)  Plaintiff also testified, however, that he was able to work full-time as a futures broker for one year, between April 2000 and April 2001, during the period of his claimed disability (which, according to Feinstein, dates back to 1996).  (R. at 248-49.)  In that position, Plaintiff alternated between sitting and standing, and was not required to do any lifting at all.  (R. at 249-50.)  Nevertheless, after one year, his lumbar spine pain forced him to leave the job.  (R. at 249.)  He briefly tried to work as a futures broker in 2002 and as a courier in 2003, but neither job lasted more than a few days.  (R. at 250.)

Following Plaintiff's testimony, William Schweihs testified as a vocational expert. Based on his review of the documentary evidence in the case and on the testimony at the hearing, which Schweihs attended, he categorized Plaintiff's work in the futures industry as highly skilled and sedentary, involving at most light physical exertion. (R. at 259.) The ALJ asked Schweihs to consider a person with Plaintiff's educational and professional experience as well as the functional capacity Plaintiff had in December 2002, including the ability: (1) to occasionally lift up to twenty pounds; (2) to frequently lift and/or carry ten pounds; (3) to stand, walk, and/or sit with normal work breaks for about six hours of an eight-hour workday; and (4) limitations on mobility of the left arm and shoulder. (R. at 260-261.) Schweihs testified that such an individual would be able to return to the past work Plaintiff had performed. (R. at 261.) This was true, Schweihs asserted, regardless of whether the individual is required to alternate between sitting and standing during the workday and regardless of whether the person can lift more than the weight of a gallon of milk. (R. at 261-62.) In response to a question from Plaintiff's attorney, Schweihs acknowledged, however, that his answer would differ if the individual could only concentrate for a period of less than two hours a day; such an individual would be unable to perform Plaintiff's past work. (R. at 263-64.)

### C. ALJ's Opinion

In a July 2005 opinion, the ALJ concluded that Plaintiff was not disabled under the Social Security Act and, thus, that Plaintiff was not entitled to receive benefits under the Social Security Act. (R. at 13-18.) The ALJ determined that Plaintiff failed to satisfy three of the five steps used to evaluate disability claims under the Social Security Act. (*Id.*)

The determination of whether an individual is disabled under the Social Security Act proceeds in five steps, as follows:

1. First, the claimant must not be engaged in substantial gainful activity.

2. Second, the claimant must have medical impairments that are "severe," meaning that the impairment must significantly limit the ability to do basic work activities, and of sufficient duration.

3.      Third, if the claimant's impairment meets or exceeds one of those enumerated in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, he will be found disabled.

4.      Fourth, if the claimant can still do past relevant work, he will not be found disabled.

5.      Finally, if the claimant can make an adjustment to perform other work, he will not be found disabled; if such an adjustment is not possible, he will be found to be disabled.

*See* 20 C.F.R. § 404.1520(a)(4).   The ALJ adhered to this five-step analysis in reviewing the evidence and found that Plaintiff satisfied the first two steps, but not the last three.  (R. at 13-18.)

In reaching this conclusion, the ALJ made several findings regarding Plaintiff's claimed disability.  The ALJ noted that, in 1995, Plaintiff was injured in a car accident, which affected Plaintiff's physical health.  (R. at 16.)  Nevertheless, Plaintiff's disability does not date back to 1995.  Instead, the ALJ's finding with respect to step one was that, because Plaintiff was gainfully employed for approximately one year from 2000 to 2001, the earliest date he can be considered disabled under the Regulations is when this job ended, in April 2001.  (R. at 18.)

Turning to step two, the ALJ concluded that Plaintiff has "severe" impairments of his spine and left shoulder, based on the Regulations' definition of severity.  (R. at 18.)[12]  The ALJ noted that,

_____

[12]      The ALJ also considered certain other conditions Plaintiff reported, namely in his cervical spine and right arm, without deeming them severe.  For example, a May 17, 1996 MRI revealed a C5-6 herniated disc, for which Plaintiff underwent a discectomy and fusion procedure later that month.  (R. at 16.)  Plaintiff testified at the hearing that his cervical spine has been "okay" since the 1996 surgeries, and Dr. Torrence's January 1998 notes state that Plaintiff's cervical spine condition is stable.  (R. at 16, 227.)  Notably, in a February 22, 2005 letter, Plaintiff informed Judge Mondi that his lumbar, not his cervical, spine condition caused him debilitating pain.  (R. at 122.)

With respect to Feinstein's right arm injury, in the same February 2005 letter, Plaintiff also made clear that, in 2002, he regained use of both arms.  (R. at 122.)  Previously, he had reported a "superior labrum anterior to posterior lesion" in his right forearm, which physical therapy had resolved.  (*Id.*)  Plaintiff also suggested that injuries to his right elbow might be disabling.  The ALJ noted that a January 2003 examination by Dr. Carroll revealed no numbness, tingling, or instability; in fact, Dr. Carroll concluded that Plaintiff's impingement was resolved by that time.  (R. at 16, 172.)  Thus, the ALJ did not find Feinstein's right arm injuries to be severe.  Plaintiff does not argue that this was an error.  Plaintiff does suggest that the ALJ should have considered these conditions

(continued...)

with regard to Plaintiff's lumbar spine, a January 1998 MRI revealed an L1 compression fracture, left foraminal disc herniation at L4-5, and degenerative disc disease at L2-3 and L4-5. (R. at 16.) But Dr. Rana's October 2002 examination revealed no local tenderness, no paravertebral muscle spasm of the spine, and no limitation of movement of the cervical, dorsal, or lumbosacral spine. (R. at 16, 168.) By October 2003, Feinstein had received three lumbar epidural steroid injections, for lumbar stenosis and lower back pain, and experienced 80% relief. (*Id.*) As of October 2003, Plaintiff could perform full lumbar flexion, extend to twenty degrees, and perform full straight leg raising in spite of his pain. (*Id.*) He was non-tender to palpation and had sensation intact to temperature. (*Id.*) Based on this, the ALJ found Feinstein's lumbar spine injury to be severe. (R. at 18.)

The ALJ also deemed Plaintiff's left shoulder injury to be severe. (R. at 18.) He noted that, in an October 2002 examination, Feinstein had no limitation in abducting his left shoulder. (R. at 16.) The next month, Dr. Carroll performed arthroscopy of Plaintiff's left shoulder, to minimize Plaintiff's tissue damage and maximize his function. (*Id.*) The ALJ concluded that Plaintiff's left shoulder pain constitutes a severe disorder. (R. at 18.)

Because the ALJ concluded that impairments of Plaintiff's lumbar spine and left shoulder were severe, he proceeded to step three, and asked whether Plaintiff's impairments met or exceeded those enumerated in the governing regulations. The ALJ determined that they do not. (R. at 15.) Specifically, the ALJ considered Listing 1.04, which catalogs disorders of the spine that result in compromise of the nerve root or spinal cord. To meet this Listing, the spinal disorder must also have one of three characteristics: nerve root compression, spinal arachnoiditis,[13] or lumbar

---

[12](...continued)
when evaluating Plaintiff's medical condition as a whole, for purposes of step three. In the court's assessment of Plaintiff's condition, the non-severe injuries to his cervical spine and right arm will be considered to the extent appropriate under the Social Security laws and regulations.

[13]     Arachnoiditis is a pain disorder, which is caused by inflamation of one of the
(continued...)

spinal stenosis resulting in pseudoclaudication.[14]  The ALJ found a lack of evidence that Plaintiff suffered from any of these three conditions, and, as a result, concluded that Plaintiff's impairments fail to meet any impairment in Listing 1.04.  (*Id.*)  The ALJ also found that Plaintiff's impairments do not medically equal any of the enumerated impairments.

Next, the ALJ turned to step four: the question of whether claimant can perform past relevant work.  Judge Mondi began by evaluating Plaintiff's residual functional capacity.  When doing so, he found that the "[c]laimant's testimony of pain, other symptoms and functional limitations . . . was not credible . . . ."  (R. at 16.)  The ALJ noted evidence that Plaintiff worked as a futures broker for one year after he sustained his injuries as well as that Plaintiff is capable of driving a truck without automatic transmission or power steering.  (*Id.*)  In addition, the ALJ considered that one of Plaintiff's epidural steroid injections gave him 80% relief, and that Plaintiff reported to Dr. Rana that his left shoulder pain is "off and on" and that his pain does not radiate to his neck or arms.  (*Id.*)  In sum, the ALJ found that treatment records and documentary evidence fail to support Feinstein's own assessment of his pain.  (*Id.*)  Judge Mondi also considered the conclusions of Drs. Gotanco and Arjmand that Plaintiff's impairments do not meet or equal a listed impairment or prevent him from performing light work.  (*Id.* at 16-17.)  Those doctors concluded that Plaintiff could perform a job that required standing and/or walking and/or sitting for a total of six hours in an eight-hour workday, so long as he had only a limited need to lift and reach with his left hand.  (R. at 16-17.)  The ALJ deemed the doctors' conclusions consistent with the medical and other evidence and, thus, adopted them.  (R. at 17.)

The ALJ also considered the vocational expert's testimony that Plaintiff's past work was

---

[13](...continued)
membranes that surround and protect the nerves of the spinal cord.  *See* http://www. ninds.nih.gov/disorders/arachnoiditis/arachnoiditis.htm.

[14]     Pseudoclaudication is leg pain experienced during walking, which is caused by spinal stenosis.  *The Merck Manual* at 749.

highly skilled but required, at most, light exertion.  (R. at 17.)  The ALJ noted that, in response to hypothetical questions, the vocational expert testified that "if the person had the residual functional capacity determined by reviewing State Agency physicians . . . the person could do past consultant work."  (*Id.*)  Even if the person in question needed to alternate between sitting and standing, he or she could perform consultant work that did not involve travel.  (*Id.*)  Likewise, a person who could lift less than the weight of a gallon of milk could perform consultant work similar to what Plaintiff had previously performed.  (*Id.*)  The ALJ did not, however, address the vocational expert's conclusion that, if a person could not concentrate for more than two hours per day, he or she could not perform consultant work.  Nor did the ALJ consider how a person who found it necessary to lie down for several hours a day would fare in such a position.  The ALJ nevertheless determined that Plaintiff has the residual functional capacity necessary to perform his past work.  (*Id.*)

Finally, with respect to step five, the ALJ noted that Plaintiff can perform a range of unskilled jobs.  (R. at 17.)  According to the ALJ, there are approximately 1,600 identified sedentary and light, unskilled occupations in eight different categories.  (*Id.*)  There is no reason to believe that Plaintiff could not perform a significant number of these jobs.  The ALJ thus found that Plaintiff's physical limitations do not meet or equal a Listing and that he can perform either past relevant work or other work existing in significant numbers in the economy. (R. at 18.)  Accordingly, the ALJ denied Plaintiff's request for disability benefits and Supplemental Security Income.  (*Id.*)

The Appeals Council denied Plaintiff's request for review of the ALJ's decision on December 22, 2005 (R. at 5-7), making the ALJ's decision the final decision of the Commissioner of Social Security.  20 C.F.R. §§ 404.955, 404.981.  Plaintiff filed this action on February 21, 2006, requesting that the court set aside the denial of benefits or remand his claim them for further proceedings.  (Docket Entry No. 1.)  The parties have filed motions for summary judgment.  (Docket Entries No. 15, 16.)  In addition, Plaintiff has moved to supplement the record with certain medical reports from Dr. Torrence.  (Docket Entry No. 18.)  For the reasons explained here, the court

concludes that Plaintiff is not entitled to supplement the record presented to the ALJ and that substantial evidence supported the ALJ's determination.

## DISCUSSION

### I.    Records Not Before the ALJ

As noted, Plaintiff asks the court for leave to supplement the record with certain medical reports from Dr. Torrence.  Plaintiff suggests that Dr. Torrence's opinion was entitled to significant weight because he was a treating physician capable of providing a "detailed, longitudinal picture" of Plaintiff's medical condition, 20 C.F.R. § 404.1527(d)(2), and in particular because of the length of the treatment relationship, 20 C.F.R. § 404.1527(d)(2)(I).  Defendant takes issue with Feinstein's characterization of the treatment relationship.  In response, Plaintiff seeks to introduce five pages of progress notes dated between February 19, 2001 and February 3, 2005,—notes not presented to the ALJ—that Plaintiff contends will reflect the nature and length of the treatment relationship. (Progress Notes, Ex. to Pl.'s Mot. to Supp.)  Plaintiff likewise seeks to introduce certain medical records the ALJ did not consider.

#### A.    Legal Standard

The court may not "consider evidence which was not before the ALJ, but which [the plaintiff] later submitted. . . ."  *Rice v. Barnhart*, 384 F.3d 363, 366, n.2 (7th Cir. 2004).  Likewise, the court cannot reverse the denial of benefits on the basis of this evidence.  *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir. 1994).  The court may, however, "order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  42 U.S.C. § 405(g) (sentence six).  Thus, Feinstein must "must meet the requirements of newness, materiality, and good cause" to prevail on this issue.  *Sample v. Shalala*, 999 F.2d 1138, 1144 (7th Cir. 1993).

#### B.    Motion to Supplement

17

Because, as explained above, Dr. Torrence provided several opinions regarding Plaintiff's medical history and condition, Plaintiff seeks to supplement the record with Dr. Torrence's progress notes to establish the longstanding relationship. In an April 20, 2005 letter, Dr. Torrence informed the ALJ that he had been treating Plaintiff since 1991. (R. at 213.) Since 1998, Dr. Torrence had observed evidence of chronic low back pain, which several physicians had, unsuccessfully, attempted to treat. (*Id.*) According to Dr. Torrence, this chronic pain forced Plaintiff to stop working in 2001. (*Id.*) Since 2001, Dr. Torrence asserted, Plaintiff had been in constant pain, was unable to sit or stand for "any substantive period of time," and was often required to lie down for relief. (*Id.*) Dr. Torrence avowed that Plaintiff is not a good candidate for surgery, but that he has always been "a willing patient" and has complied with medical recommendations he receives. (*Id.*) Dr. Torrence was "overwhelmingly convinced" that Plaintiff's back condition renders him disabled. (*Id.*)

As explained above, sentence six remand is appropriate only if the records are new and material, and there is good cause for not including them in the administrative record. Here, Plaintiff can demonstrate neither newness nor good cause. New evidence is evidence that was "not in existence or available to the claimant" when the administrative hearing was conducted. *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997) (citation omitted). Dr. Torrence's progress notes—all dated between 2001 and 2005—were clearly in existence at the time of the May 2005 administrative hearing. Moreover, they are the plaintiff's own medical records, in the possession of his treating physician. Several other notes from Dr. Torrence are part of the administrative record. In the absence of any evidence to the contrary, the court presumes that the additional progress notes he now seeks to offer also were available to Plaintiff at the time of the hearing. In addition, Plaintiff has identified no good cause for his failure to make these progress notes part of the administrative record. That the ALJ rejected Dr. Torrence's opinion does not give Plaintiff—who was represented by counsel at that hearing–license to buttress that opinion after the fact. To hold otherwise "would amount to automatic permission to supplement records with new evidence after

the ALJ issues a decision in the case, which would seriously undermine the regularity of the administrative process." *Id.* Accordingly, a sentence six remand is inappropriate.

### C.    Additional Medical Evidence

According to the plaintiff, the ALJ also erred by not accepting various medical records, including findings from x-rays, CT scans, MRI images, discography results, photographs, and a CD-ROM disk containing studies conducted at Northwestern Memorial Hospital. In support of this argument, Plaintiff relies upon 20 C.F.R. § 404.1527(b), which provides: "In deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." The court is not certain what, precisely, these records are, as much of what Plaintiff describes does appear in the administrative record. Nevertheless, the court finds no error in the ALJ's refusal to consider any materials that are not made part of the record.

While Plaintiff does not explicitly ask for a sentence six remand based on the failure to include the medical documents in the record, the court presumes he seeks this relief. Again, however, Plaintiff fails to demonstrate newness or good cause justifying a sentence six remand. According to Plaintiff, he attempted to give the records to the ALJ before the hearing, but the ALJ declined to accept them. (Pl.'s Mot. at 2-3.) But at the beginning of the hearing, when the Plaintiff, who was represented by counsel, was asked whether there were "any other medical or employment records or other documents that you're aware of that may be material which are not into evidence," Plaintiff's counsel asked only to supplement the record with tax returns and a single MRI, both of which were received into evidence. (R. at 245-247.) Again at the end of the hearing, counsel for Plaintiff "just ask[ed] one thing": to supplement the record with missing tax returns. (R. at 266.) Plaintiff offers no explanation for his failure to ask the ALJ to consider any additional records at the hearing (and, again, the court is not certain what those records are). Because Plaintiff and his counsel failed to introduce the records during the hearing, his allegation that the ALJ made his

decision based on incomplete evidence is insupportable. Thus, the court finds no basis for ordering a sentence six remand, or concluding that the ALJ erred in failing to consider any medical records.

## II.    ALJ's Decision

### A.    Standard of Review

In its review of the Commissioner's decision, the court may not engage in its own analysis of whether Plaintiff is disabled, "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). The court asks only whether the ALJ's factual findings are supported by substantial evidence—that is, by the type of evidence that a reasonable person would accept as adequate support for the ALJ's conclusions. *Id.* Here, neither party suggests that the ALJ erred in determining that Plaintiff has not been engaged in substantial gainful activity since April 2001 (step one) or that Plaintiff suffers from a severe impairment (step two). Plaintiff does contend, however, that the evidence available to the ALJ ought to have led him to conclude that Plaintiff's impairments equal the criteria of one of the Listing of Impairments (step three) and that Plaintiff's residual functional capacity precludes him from performing past relevant work (step four) or other light work (step five). In other words, Plaintiff argues that the ALJ erred in his determinations on these three steps.

### B.    Listing of Impairments

With respect to step three, Plaintiff argues that he meets Listing § 1.04, Disorders of the Spine. (Pl.'s Mem. at 6.) That Listing includes "[d]isorders of the spine . . . resulting in compromise of a nerve root . . . or the spinal cord," accompanied by:

> A.    Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight leg raising test (sitting and supine); or

B.    Spinal arachnoiditis confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

C.    Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Part 404, Subpart P, App. 1, 1.04(A).  "To meet or equal a listed impairment, the claimant must satisfy all of the criteria of the listed impairment."  *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999).  Here, Plaintiff never identifies which 1.04 sub-category he believes he meets, or how. Nor could he: the medical evidence fails to demonstrate that Plaintiff meets any of the three categories.

First, the ALJ determined that Plaintiff had failed to show nerve root compression as described in Listing 1.04A.  Plaintiff's August 2003 motor and sensory testing was bilaterally equal and unremarkable in both legs.  (R. at 15.)  In the report Judge Mondi cited, Dr. Katz also stated that Feinstein had unremarkable gait testing and heel-and-toe walking.  (R. at 187.)  In addition, Plaintiff had full range of motion in his lumbar spine, although 90-degree flexion and 20-degree extension each produced moderate pain.  (*Id.*)  His side bending was also full range, though it produced back pain.  (*Id.*)  Finally, straight leg raising for either leg to 80-degrees produced "only mild low back pain." (*Id.*)  Dr. Rana's report confirms that Feinstein had no limitation of movement in the spine and that Plaintiff's motor power was intact.  (R. at 168.)  In May 2004, Dr. Haak did record that Plaintiff's "range of motion is limited secondary to low back pain," (R. at 214), but there is no indication that Dr. Haak considered this evidence of nerve root compression.  In fact, there is no evidence of nerve root compression anywhere in the record before the court.

With regard to 1.04B, there is no mention or evidence of spinal arachnoditis in Plaintiff's medical records. Furthermore, no physician or testimony refers to severe burning or painful dysesthesia.

For purposes of Listing 1.04C, the ability to ambulate effectively consists of being able to sustain "a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living." 20 C.F.R. Part 404, Subpart P, App. 1, 1.00B2b(2). While there is evidence that Plaintiff suffers from spinal stenosis, it appears that the condition has not resulted in difficulty walking sufficient to trigger this Listing. According to Dr. Rana, Plaintiff's gait was normal and he was capable of walking a couple of blocks in October 2002. (R. at 166, 168.) In August 2003, Dr. Katz also found that Plaintiff's gait and heel and toe walking were normal. (R. at 187.) In March 2004, Dr. Cybulski described Plaintiff's gait as not antalgic, meaning that he was not forced to take a posture intended to lessen his pain. (R. at 195.) Plaintiff confirmed during the administrative hearing that he can walk a few blocks to the local drug store. (R. at 254, 256.) He drives to the local grocery store. (*Id.*) He reports no need to use a walker, crutch, cane, or other assistive advice. He can climb a flight of stairs unassisted. (R. at 254.) Thus, he can ambulate effectively for purposes of 1.00B2b(2).

Finally, Plaintiff urges that the combined effect of all of his impairments, including his depression, back pain, and problems with his back, shoulder, elbow, and hand, should be considered in determining whether his condition is equal to those described in Listing 1.04. He suggests that the ALJ erred by failing to consider the totality of his medical conditions. With respect to the injuries to Plaintiff's hand and shoulder, the court finds no error in the ALJ's failure to consider them explicitly. The governing Regulations provide that, "[u]nless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1509. Yet it appears that Plaintiff's hand and elbow pain were all resolved within six months. Plaintiff first sought treatment for his hand and elbow problems in May

2002, and there is no evidence that he had hand or elbow problems before seeking treatment. (R. at 152.) By January 2003, Dr. Carroll stated that, at least with respect to the Plaintiff's hand and elbow, he could return to "full and unrestricted activity." (R. at 172.) Therefore, Plaintiff cannot claim that his hand and elbow injuries affected his medical state, within the meaning of the Regulations. Any condition incorporating these injuries was too short-lived to trigger Social Security benefits eligibility under relevant provisions. With respect to Plaintiff's claimed depression, there is simply insufficient evidence that the condition is disabling.[15] During the hearing, Plaintiff testified that his depression is not "a major problem" for him. (R. at 253.) There is no further evidence regarding the impact of his depression nor any basis from which to conclude that it contributes to Plaintiff's limitations.

The ALJ did find that the Plaintiff's low back pain and left shoulder injury were severe, and he specifically took that limitation into account when forming his hypothetical question to Schweihs. (R. at 18, 258-263.) This was all he was required to do, in light of the medical evidence Plaintiff presented. The court therefore concludes that the ALJ properly considered the combined effect of the Plaintiff's shoulder and lumbar spine conditions in determining whether the Plaintiff was disabled under his step four and five analysis.

### C. Residual Functional Capacity Steps Four and Five

The evidence the ALJ relied on in reaching his decision with respect to Plaintiff's residual functional capacity is set forth in some detail above. Plaintiff contends that it was insufficient for several reasons: the ALJ wrongly deemed Plaintiff's testimony non-credible, the ALJ failed to account for the mental demands of Plaintiff's work in the financial services industry, the ALJ disregarded the opinion of one of Plaintiff's treating physicians, the ALJ failed to consider certain

---

[15]     Plaintiff states that he saw a psychiatrist, Dr. Michael Solomon, for a few months but did not find him helpful. (R. at 93.) There are no treatment records from Dr. Solomon in the administrative record.

hypothetical questions posed to the vocational expert, and the vocational expert's assessment was based on his wrongful belief that in 2001, Plaintiff engaged in professional activities that he had not engaged in since 1995. As explained below, the court concludes none of these favors are sufficient to disturb the ALJ's determinations.

### 1. Plaintiff's Credibility

In his written opinion, the ALJ concluded that Plaintiff's "testimony of pain, other symptoms and functional limitations, when compared against the objective evidence . . . was not credible." (R. at 16.) "Credibility determinations will not be overturned unless they are clearly incorrect." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007). Here, the court cannot find that the ALJ's decision was clearly incorrect. Supporting his determination, the ALJ relied on the objective medical evidence, Plaintiff's daily activities, the effectiveness of treatment, and medical findings, which are explicitly set out as proper factors to determine credibility. SSR 96-7p. Specifically, Judge Mondi noted that Plaintiff worked as a futures broker from April 2000 to April 2001, *i.e.* for one full year after he claims his period of disability began. (R. at 249.) At the time of the May 2005 hearing, he remained able to climb a flight of stairs, to bend and twist, to care for his home, to walk to the drug store, and to drive to the grocery store. (R. at 254-256.) Plaintiff also drives a manual transmission truck without power steering. (R. at 255.) The ALJ also relied on information Dr. Rana obtained from Plaintiff: that he had no radiation of pain from his arm and neck and that pain in his left shoulder was "off and on." (R. at 16.) The ALJ noted that Plaintiff told Dr. Katz that the 2003 epidural steroid injections gave him 80% relief. (R. at 16.) In September 2002, Plaintiff could not perform yard work or heavy household chores; he could, however, prepare and eat meals, dress himself (with pain), maintain his personal hygiene (though washing his hair and face caused difficulty), drive, and shop. (R. at 114-116.) And, although Judge Mondi did not cite this evidence, as of May 2002, Plaintiff was an avid motorcycle rider, according to Dr. Carroll. (R. at 152.)

In *Arnold*, the ALJ accepted the plaintiff's testimony regarding the nature of his symptoms and precipitating causes of those symptoms but concluded that the plaintiff's preferred means of dealing with those symptoms, which was to take breaks, was not medically necessary. *Arnold*, 473 F.3d at 823. In reaching this conclusion, the ALJ considered "compelling medical evidence" and the plaintiff's own disclosure of daily work activities. *Id.* The ALJ also considered the plaintiff's prior work history and testimony of lay persons. *Id.* This case is substantially similar to *Arnold*, in that the ALJ accepted that Plaintiff does have severe impairments, for purposes of the Social Security Act. He rejected, however, Plaintiff's testimony regarding the functional limitations that the pain places on him. In doing so, the ALJ relied on the medical evidence in the administrative record, as well as evidence of plaintiff's current ability to complete activities of daily life. This was not clearly incorrect. *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995) (upholding ALJ's credibility determination where it was supported by the claimant's work history and medical evaluations).

Plaintiff compares this case to *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001), where the ALJ merely stated that there were unidentified "inconsistencies" between the medical evidence and the claimant's alleged pain. There, the ALJ provided no further explanation or specific reason for the determination that the plaintiff's testimony was not credible. *Id.* Because there was no indication that the ALJ had examined the full range of medical evidence, *Zurawski* court concluded that the ALJ's credibility determination required greater elaboration. *Id.* at 888. Here, on the other hand, there is evidence that the ALJ considered both medical records and Plaintiff's medical condition. Finally, there is no argument that, even if Plaintiff's concentration is impaired such that he cannot return to his past work for purposes of step four, he may be able to function in one of the 1,600 sedentary or light exertion jobs the ALJ identified as other employment opportunities, for purposes of step five. Accordingly, the court finds no error.

### 2. Dr. Torrence's Opinion

Plaintiff next contends that it was error for the ALJ to disregard Dr. Torrence's opinions when reaching his determination regarding Plaintiff's disability. Dr. Torrence opined in his letter to Judge Mondi, for example, that Plaintiff is disabled. (R. at 213.) But a treating physician's opinion that a claimant is disabled does not automatically result in a finding of disability, as that is a determination entrusted to the ALJ. 20 C.F.R. § 404.1527(e)(1); *see also* 20 C.F.R. § 404.1527(d)(2). In fact, nothing in the Act directs the ALJ to give any particular weight to the medical provider's opinion that Plaintiff is disabled. *See Johansen v. Barnhart*, 314 F.3d 283, 288 (7th Cir. 2002) (holding that treating physician's "general opinion that [plaintiff] was 'unable to work gainful employment because of his chronic neck [pain], left arm pain and low back pain' is not conclusive on the ultimate issue of disability, which is reserved to the Commissioner"). The ALJ therefore did not commit error by disregarding Dr. Torrence's conclusion that Plaintiff is disabled.

Dr. Torrence also opined that Plaintiff cannot sit or stand for "any substantive period of time," and that Plaintiff is "often" forced to lie down for some relief. (R. at 213.) When determining what weight, if any, to give a treating physician's opinion, the ALJ should consider (1) the length of treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors. 20 C.F.R. §§ 404.1527(d). Here, the ALJ did not explicitly mention Dr. Torrence's opinion. An ALJ may not altogether ignore evidence contrary to his findings, but he or she "need not provide a complete written evaluation of every piece of testimony and evidence," *Henderson by Henderson v. Apfel*, 179 F.3d 507, 514 (7th Cir. 1999) (quoting *Diaz*, 55 F.3d at 308). Instead, "the ALJ must sufficiently articulate [his or her] assessment of the evidence to assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning." *Jones v. Barnhart*, 539 F. Supp. 2d 1057, 1064-1065 (N.D. Ill. 2008) (quoting *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993)) (internal quotation marks and additional citations omitted).

In *Henderson*, the Seventh Circuit considered the ALJ's failure to refer to three reports in which a physician concluded that the plaintiff was disabled. 179 F.3d at 514. Ultimately, the court found no error where the reports did not present clinical findings of disability that met or equaled any of the Listings, and where the reports did not contradict the ALJ's finding that the plaintiff had residual functional capacity. *Id.* Similarly, here, Dr. Torrence's letter includes no clinical findings related to the legal standards in this case but, rather, presents only his personal legal assessment, without context or other support for his certainty that Plaintiff is disabled. Unlike in *Henderson*, Dr. Torrence also opined that Plaintiff often needs to lie down for relief from pain; Dr. Torrence's letter does not, however, state how frequently Plaintiff is required to lie down, how long he must remain lying down, or what sort of activity forces Plaintiff to lie down. Thus, Dr. Torrence's letter does not provide sufficient basis to rebut the ALJ's findings regarding Plaintiff's residual functional capacity. Nor is there evidence that his report was based on anything other than Plaintiff's subjective reporting of his symptoms; but the ALJ had already concluded that Plaintiff's report of his attempts to cope with the pain he suffers was not credible. (R. at 16.) The court finds no error in the ALJ's rejection of Dr. Torrence's opinion.

### 3. Concentration

Plaintiff also contends that the ALJ erred in not considering the physical demands of sitting and the mental demands of his previous employment, when considering his residual functional capacity. The court accepts as true that Plaintiff's prior work required significant concentration. Significantly, however, Plaintiff has provided no evidence aside from his own testimony–which, as discussed above, the ALJ was entitled to reject–to suggest that he lacks the ability to concentrate. No physician has buttressed Plaintiffs' claims regarding limitations in that regard. Dr. Rana reported that in October 2002 Plaintiff had a "fair" ability to concentrate. (R. at 168.) A "claimant's statement(s) about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p; *Clifford v. Apfel*, 227

27

F.3d 863, 871 (7th Cir. 2000) ("the ALJ must consider a claimant's subjective complaint of pain if supported by medical signs and findings").  Without supporting medical evidence, the ALJ did not err in refusing to defer to Plaintiff's testimony regarding his symptoms.  SSR 96-7p.  Moreover, Plaintiff's testimony regarding his ability to concentrate is not consistent.  Plaintiff himself testified at the hearing that he has "a little bit" of difficulty reading, which is a combination of decreased attention span and getting older.  (R. at 248.)  No evidence in the record directly addresses the severity of Plaintiff's concentration difficulties, or their impact on his daily life or professional possibilities.  Thus, Plaintiff has not met his burden of proof with respect to this issue.  *Henderson*, 179 F.3d at 514 (holding that ALJ need not specifically refute claims where the ALJ's omission of a particular limitation finds ample support in the record).

### 4.    Vocational Expert

Plaintiff also urges that the vocational expert's testimony contained significant errors.  First, Plaintiff suggests that the vocational expert was asked to respond to flawed questions.  "Hypothetical questions posed to vocational experts ordinarily must include *all* limitations supported by medical evidence in the record."  *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002) (emphasis in original).  That said, "all that is required is that the hypothetical question be supported by the medical evidence in the record."  *Cass v. Shalala*, 8 F.3d 552, 555-556 (7th Cir. 1993) (citation omitted).  In other words, the hypothetical question need not include information not supported by the medical evidence in the record.  Plaintiff points out that no hypothetical posed to the vocational expert referenced Plaintiff's alleged depression or need to lie down each day.  As discussed above, however, the ALJ was entitled to disregard Plaintiff's testimony that it is medically necessary for him to lie down each day as well as his subjective testimony regarding his inability to concentrate.  Likewise, Plaintiff's depression was irrelevant to the vocational expert, because Plaintiff had testified that it did not cause him problems.  The court finds the ALJ did not err in failing

to include these claimed symptoms, not supported by the medical record, in any hypothetical posed to the vocational expert.

Moreover, even if there had been an error, the ALJ cured it by establishing during the hearing that the vocational expert reviewed the medical evidence and listened to Plaintiff's testimony. *See Ragsdale v. Shalala*, 53 F.3d 816, 820 (7th Cir. 1995) ("an incomplete hypothetical question may be cured by a showing that prior to testifying the vocational expert reviewed the claimant's record containing the omitted information"). Schweihs testified that he reviewed the evidence in the administrative record and listened to Plaintiff's testimony at the hearing. (R. at 259.) He made clear that he was aware of the highly skilled nature of Plaintiff's prior work, as well as that it required Plaintiff to concentrate and multi-task. (R. at 263.) Thus, any defect in the questions was effectively cured by the vocational expert's familiarity with the record.

Finally, Plaintiff claims that the vocational expert erred by assuming that Plaintiff's work between 2000 and 2001 included giving seminars and presentations and traveling. (R. at 260.) According to Plaintiff, he did not do such work after 1995. Neither Plaintiff nor his attorney sought to correct this alleged misstatement at the hearing. Even in this briefing, Plaintiff provides no support for his assertion that the vocational expert's testimony was in error. Moreover, Plaintiff identifies no significance to this error, if it was in fact an error. Consequently, the court cannot consider it a basis to criticize the vocational expert's analysis or the ALJ's reliance on that analysis.

## CONCLUSION

For the reasons stated above, the ALJ's decision was supported by substantial evidence. Thus, Plaintiff's Motion for Summary Judgment (15) and Motion to Supplement the Record (18) are denied. Defendant's Motion for Summary judgment (16) is granted.

ENTER:

Dated: July 31, 2008 _____

REBECCA R. PALLMEYER
United States District Judge